ACCEPTED
05-14-00671-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
9/15/2015 4:47:22 PM
LISA MATZ
CLERK

5th Court of Appeals
FILED: 09/15/2015
Lisa Matz, Clerk

*The State requests oral argument only if Appellant argues*

**No. 05-14-00671-CR**

IN THE COURT OF APPEALS
FOR THE FIFTH DISTRICT OF TEXAS
AT DALLAS

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
9/15/2015 4:47:22 PM
LISA MATZ
Clerk

**WILLIAM GERARD PALMER,
APPELLANT**

**V.**

**THE STATE OF TEXAS,
APPELLEE**

*On appeal from Criminal District Court No. 4 of Dallas County, Texas
In Cause No. F12-00445*

**STATE'S BRIEF**

*Counsel of Record:*

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

**Christine Womble  (SBT 24035991)**
**Assistant District Attorney**
Frank Crowley Courts Building
133 N. Riverfront Boulevard, LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*
CWomble@dallascounty.org

*Attorneys for the State of Texas*

# TABLE OF CONTENTS

Table of Contents......................................................................................ii-iii

Index of Authorities...............................................................................iv-vii

Statement of the Case ..................................................................................1

Statement of Facts................................................................................. 1-17

Summary of the Argument ................................................................... 17-18

Argument ....................................................................................................18

State's Response to Issue Nos. One and Two .............................................18

> **THE TRIAL COURT PROPERLY EXCLUDED THE TESTIMONY OF DR. KRISTI COMPTON. ALTERNATIVELY, ANY ALLEGED ERROR IS HARMLESS.**

State's Response to Issue No. Three...........................................................35

> **APPELLANT HAS FAILED TO PRESERVE ERROR FOR THIS COURT'S REVIEW. IN ANY EVENT, EVEN ASSUMING ERROR WAS PRESERVED, THE TRIAL COURT PROPERLY OVERRULED HIS REQUEST FOR AN INSTRUCTION REGARDING THE LESSER-INCLUDED OFFENSE OF MANSLAUGHTER.**

State's Cross-Point.....................................................................................43

> **THE JUDGMENT SHOULD BE MODIFIED OR REFORMED TO CORRECTLY REFLECT APPELLANT'S SENTENCE.**

Prayer .........................................................................................................45

Certificate of Compliance ...................................................................................45

Certificate of Service ..........................................................................................46

# INDEX OF AUTHORITIES

**Cases**

*Almanza v. State*,
686 S.W.2d 157 (Tex. Crim. App. 1985) ....................................................... 37, 38, 43

*Arnold v. State*,
234 S.W.3d 664 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ...................... 40

*Bigley v. State*,
865 S.W.2d 26 (Tex. Crim. App. 1993) ................................................................. 44

*Blanton v. State*,
No. 74,214, 2004 Tex. Crim. App. LEXIS 2210 (Tex. Crim. App. 2004) (not designated for publication) ................................................................................... 39

*Boles v. State*,
598 S.W.2d 274 (Tex. Crim. App. 1980) ............................................................... 38

*Cardenas v. State*,
30 S.W.3d 384 (Tex. Crim. App. 2000) ................................................................. 39

*Cavazos v. State*,
382 S.W.3d 377 (Tex. Crim. App. 2012) .............................................. 37, 40, 41, 43

*Crane v. Kentucky*,
476 U.S. 683 (1986) ............................................................................................... 23

*Erazo v. State*,
144 S.W.3d 487 (Tex. Crim. App. 2004) ............................................................... 24

*Estrada v. State*,
334 S.W.3d 57 (Tex. App.—Dallas 2009, no pet.) ................................................ 44

*Gallo v. State*,
239 S.W.3d 757 (Tex. Crim. App. 2007) ............................................................... 24

*Hernandez v. State*,
438 S.W.3d 876 (Tex. App.—Texarkana 2014, pet. ref'd) ................................... 23

*Hutch v. State*,
922 S.W.2d 166 (Tex. Crim. App. 1996) .............................................................. 38

*Jackson v. State*,
160 S.W.3d 568 (Tex. Crim. App. 2005) ......................................................... 25, 26

*King v. State*,
953 S.W.2d 266 (Tex. Crim. App. 1997) ........................................................ 33, 35

*Lizcano v. State*,
AP-75,879, 2010 Tex. Crim. App. Unpub. LEXIS 270 (Tex. Crim. App. May 5,
2010) (not designated for publication) ................................................................. 26

*Marshall v. State*,
No. 11-10-00057-CR, 2012 Tex. App. LEXIS 1083 (Tex. App.—Eastland Feb.
9, 2012, no pet.) (not designated for publication) .................................................. 30

*Mathis v. State*,
67 S.W.3d 918 (Tex. Crim. App. 2002) ................................................................ 39

*Mays v. State*,
318 S.W.3d 368 (Tex. Crim. App. 2010) ............................................................. 25

*Middleton v. State*,
125 S.W.3d 450 (Tex. Crim. App. 2003) ............................................................. 37

*Montgomery v. State*,
810 S.W.2d 372 (Tex. Crim. App. 1990) (op. on reh'g) ................................... 23, 24

*Morales v. State*,
32 S.W.3d 862 (Tex. Crim. App. 2000) ............................................................... 33

*Ngo v. State*,
175 S.W.3d 738 (Tex. Crim. App.  2005) ............................................................ 38

*Penry v. State*,
903 S.W.2d 715 (Tex. Crim. App. 1995) ............................................................. 25

*Rice v. State*,
333 S.W.3d 140 (Tex. Crim. App. 2011) .............................................................36, 37

*Romero v. State*,
800 S.W.2d 539 (Tex. Crim. App. 1990) ...................................................................23

*Ruffin v. State*,
270 S.W.3d 586 (Tex. Crim. App. 2008) ............................................................25, 26

*Teel v. State*,
No. 02-09-00150-CR, 2010 Tex. App. LEXIS 9391 (Tex. App.—Fort Worth,
Nov. 24. 2010, pet. ref'd) (not designated for publication)....................................27

*United States v. Cameron*,
907 F.2d 1051 (11th Cir. 1990) ...............................................................................26

*Vasquez v. State*,
919 S.W.2d 433 (Tex. Crim. App. 1996) ...................................................................38

*Ward v. State*,
AP-75,750, 2010 Tex. Crim. App. Unpub. LEXIS 94 (Tex. Crim. App. Feb. 10,
2010) (not designated for publication).......................................................................32

*Weatherred v. State*,
15 S.W.3d 540 (Tex. Crim. App. 2000) .....................................................................33

*Wiley v. State*,
No. 09-07-00436-CR, 2009 Tex. App. LEXIS 225 (Tex. App.—Beaumont Jan.
14, 2009, pet. ref'd) (not designated for publication) .............................................28

*Wyatt v. State*,
23 S.W.3d 18 (Tex. Crim. App. 2000).......................................................................22

*Yebra v. State*,
No. 08-12-00201-CR, 2014 Tex. App. LEXIS 10875 (Tex. App.—El Paso Sept.
30, 2014, no pet.) (not designated for publication) ..................................................30

**Statutes**

Tex. Code Crim. Proc. Ann. art. 36.14 ...................................................................38

Tex. Code Crim. Proc. Ann. art. 36.19 ...................................................................37

Tex. Code Crim. Proc. Ann. art. 37.09 ........................................................... 36, 37

Tex. Code Crim. Proc. Ann. art. 38.36(a)....................................................... 25, 31

Tex. Penal Code Ann. § 6.03 (a-b) ................................................................. 31-32

Tex. Penal Code Ann. § 6.03(c)..............................................................................40

Tex. Penal Code Ann. § 12.31(a)(2)........................................................................44

Tex. Penal Code Ann. § 19.04(a)............................................................................40

**Rules**

Tex. R. App. P. 43.2(b)............................................................................................44

Tex. R. App. P. 44.2(b)..................................................................................... 33, 35

Tex. R. Evid. 401 ...................................................................................................23

Tex. R. Evid. 403 ........................................................................................ 24, 25, 31

Tex. R. Evid. 702 ............................................................................................. 24, 26

**TO THE HONORABLE COURT OF APPEALS:**

The State of Texas submits this brief in response to the brief of Appellant, William Gerard Palmer.

## STATEMENT OF THE CASE

Appellant entered a plea of not guilty to the offense of capital murder. (RR4:6).   The jury found him guilty and the Court sentenced him to confinement for life without the possibility of parole in the Texas Department of Criminal Justice.  (CR:500-04; RR8:155).

## STATEMENT OF FACTS

Appellant stabbed to death his wife, Donya, and his in-laws, Mary and Raymond "Ray" Davis.

### *The Palmer Family*

Appellant was married to Donya Palmer.  (RR4:64).   They had three children: Brianna, Danielle, and Brett.  (RR4:57-58).    Donya's father is Ray Davis. (RR4:53-54; SX5).  Mary Davis is her stepmother.  (RR4:52-56).  Kelley Davis Dennehy is her half-sister.  (RR4:52-56; SX5).

Appellant and Donya's marriage was "okay at first, but the last couple of years it was a lot of arguing and they weren't really getting along."  (RR4:214). They no longer showed affection toward each other.  (RR5:44-45).   Donya suffered from Lupus, an autoimmune disease, which causes tremendous fatigue. (RR4:214; RR5:41; RR6:15).  Appellant did not like the fact that Donya stayed in

1

bed and missed a lot of family gatherings and events. (RR4:214; RR5:5). Appellant would yell and cuss at Donya. (RR4:215). At times, he would "raise his voice, saying, Oh, you're so worthless. Get out of bed. You're being lazy." (RR5:58).

Donya was "hooked on" an online social networking game, Mafia Wars. (RR5:41). She spent a great deal of time playing the game on her computer. (RR5:22-23). "She would stay up to like 3:00 or 4:00 in the morning playing Mafia Wars, knowing she had to be up at 5:00 in the morning for work." (RR6:15).

A few weeks before the murders, Appellant told the children that Donya had decided that they should "go their separate ways[.]" (RR4:219). Appellant moved out of the house and into a motel for a week. (RR4:219). He "was very upset . . . he was really heartbroken." (RR4:220). He wanted to reconcile with Donya. (RR4:220-21). Appellant continued to function normally. (RR4:221). He maintained his routine of going to church and to work. (RR4:221-22). There was no indication that Appellant was experiencing any mental issues. (RR4:223).

At some point, Donya left and travelled to Arkansas to spend time with

another man.[1]  (RR4:223, 228).  She was gone for about a week.  (RR4:223).

Danielle became angry with her mother.  She testified:

> I was mad because my dad had told us, the kids, that my mom had left
> us and she was never coming back and that she took the dog and she
> maxed out the bank account and left him with no money for us to start
> over.  He basically just made up a lot of lies to us and just basically
> told us that she was never coming back, that she left us for good.

(RR4:224).  Danielle refused Appellant's request that she text Donya that if

Appellant got remarried that the new woman would be her new mother.

(RR4:225-26).  It was about this time that Appellant started saying "that [Donya]

was surrounded by demons and that it was because she played Mafia Wars too

much."  (RR5:30).  Danielle testified that "[Appellant] wanted us to get on his

side so we could stay with him [after the separation].  So, basically, he was saying

stuff so we would want to be with him and not her."  (RR5:30).

Donya returned from Arkansas on Wednesday, January 25th.  (RR4:63-64,

227).  She planned to stay at the Davis house and wanted Danielle to pick up their

dog, Rebel.  (RR4:63-64,227).  Before going to pick up the dog, Danielle,

Brianna, Brett and Appellant went to church.  (RR4:228).  Appellant "went to man

church, he was by himself."  (RR4:229).  The kids attended services for teenagers.

(RR4:229).  Afterward, Appellant said "that God really spoke to him tonight and

---

[1] Donya told Danielle that she had gone to Arkansas to stay with her friend, Jacqueline.
(RR5:11-12).  In fact, she had gone to see a man.

3

told him what he needed to do." (RR4:229). The family went home and then later out to the Davis house to see Donya. (RR4:64, 69, 231; RR5:51).

At the Davis house, Danielle spent some time with Donya. (RR4:232). She apologized for sending Donya mean text messages. (RR4:232; RR5:12). She learned that, contrary to what Appellant had told her, Donya had not maxed out their bank account, leaving them without anything. (RR4:232). Donya told Brett that she would "do whatever it takes to make this work." (RR5:53). Kelley described the visit as follows:

> It was kind of awkward between the kids and Donya, just because I think - - their own confusion. They didn't understand what was going on. And Donya was just - - she was very quiet, very quiet. And he came over, when he got the dog in hopes, you know, that he wanted to make the marriage work. He came over and told everybody he loved them and hugged them before he left or whatnot. And he told Donya that he loved her and then she just looked at me and rolled her eyes.

(RR4:69-70). Appellant and the kids stayed for about thirty minutes then left. (RR4:71). When Appellant and the kids were getting ready to leave, Appellant was upset and kept asking Mary whether she had talked to Donya and whether Donya was done with their marriage. (RR4:233). Mary told him that she didn't know. (RR4:233).

Appellant was quiet on the drive home to Sachse. (RR4:234). He behaved normally. (RR4:234-25; RR5:32, 53).

4

*The Murders*

The next morning, back at the Davis house, Kelley got up at about 6 a.m. (RR4:74). She woke Donya to get ready for work. (RR4:74-75). Donya went outside to her car, a Durango, to get her clothes. (RR4:75). Kelley heard screaming and walked into the living room to see what was going on. (RR4:75). "[The screaming] was coming from the front of the house and as I was walking into the living room, Donya came running through the front door with blood on her and [Appellant] was chasing her with a knife." (RR4:75). Appellant was dressed in a black sweatshirt, jeans, black weightlifting gloves and a black toboggan. (RR4:75, 101). Donya was screaming for help. (RR4:75). Appellant was stabbing her. (RR4:78).

Kelley called out for her father. (RR4:76). Ray tried to make his way to Kelley, but Appellant began stabbing him. (RR4:76). Ray fell to the floor, asking Appellant why he was stabbing him. (RR4:76). Appellant responded, "I'm sorry, I have to. Your're here." (RR4:76). Kelley ran away, cutting her arm on Appellant's knife as she fled. (RR4:78, 80). As Kelley ran upstairs to her daughter, Mary was on her way downstairs. (RR4:76, 79). Kelley and Jaiden hid in a closet. (RR4:77). She testified:

> I put me and my daughter in the closet and put her behind my dad's clothes. And I could hear a lot of thudding and banging. And I know where the closet is downstairs, below the closet from the front door is where the end of stairs end and I heard a very loud thud and I knew

5

that that was my stepmother, that he had gotten her. And he - - I heard him opening up the door, asking where we were. I remember hearing the bedroom door hitting the wall up against - - in the closet. The other side was where the door was.

And I heard him running through the bathroom, opening up the shower curtain and looking into the other bedroom and stuff. And then I heard him come back down and he was like, Shit. Like, he couldn't find us. Then he went back downstairs. And after he went back downstairs, I carefully opened up the closet door and went and got my step mom's cell phone off of her dresser and went back in the closet and called 911.

(RR4:77). Kelley stayed on the phone with the 911 dispatcher until police arrived. (RR4:85-86; SX13).

Senior Corporal Alyssa Wadas was dispatched to "a cutting call[.]" (RR4:21). "[T]hree people had been stabbed and . . . the caller was hiding in a closet with a small child." (RR4:21). When Corporal Wadas and her partner, Officer Brian Madalinski, arrived and pulled into the driveway, she observed two vehicles parked outside the house. (RR4:22, 24). The driver's side door of one of the vehicles, a red Durango, was open. (RR4:24-25). The officers approached and entered the house. They found three dead bodies. (RR4:26). All three had been stabbed. (RR4:26). The officers searched the house, but did not locate the suspect. (RR4:31).

Senior Corporal Lance Raymond found Kelley hiding upstairs with her daughter, Jaiden. (RR4:32, 55, 113; SX79-80). Kelley told the officers that "her brother-in-law had been at the house and he had stabbed his wife." (RR4:36).

6

Kelley described the knife, "that it would look something like a filet knife out of a kitchen." (RR4:36). Officer Raymond conveyed the information Kelley provided to dispatch. (RR4:117).

A short time later, Deployment Officer Ubaldo Lopez was assigned to conduct surveillance on Appellant's home in Sachse. (RR4:140-41). Officer Lopez parked about a half a block away, got out and "[got] eyes on the actual physical address of it." (RR4:147). As he walked back to his vehicle, he "heard an engine start and I saw that the lights came on, on the van that we were looking for." (RR4:147). He followed the van to a nearby fast-food restaurant, Taco Bueno. (RR4:147-48; SX83-84, 97-98). When Appellant pulled into the drive-through, Officer Lopez drove to the parking lot of the bank where the rest of his team was planning Appellant's arrest. (RR4:151). He updated them regarding Appellant's location. (RR4:151). Appellant was arrested as he left the drive-through of the Taco Bueno. (RR4:151-52, 163).

Officer Gilbert Padilla testified that there was nothing unusual about Appellant's physical or mental affect when he arrested him at the Taco Bueno. (RR4:174, 176). Officer Padilla did, however, observe that Appellant had tape around some of his fingers and that blood was coming out from under the tape. (RR4:176-77).

7

At police headquarters, Officer Michael Gonzalez photographed Appellant and collected his clothing. (RR4:191, 194, 199-201; SX207). Officer Gonzalez testified that Appellant "had a red substance on his right little finger. [He] thought it was blood. [He] noticed blood on the fingernail of his left hand under by the electrical tape." (RR4:201-02; SX155-62). His injuries "appeared pretty major . . . like they were very painful;" Appellant started bleeding when he removed the tape from his fingers. (RR4:202).

Officer Gonzalez testified that he had no problem communicating with Appellant. (RR4:205-06). He followed directions and appeared to understand what the officer was talking about. (RR4:206). "Everything seemed normal." (RR4:206). Officer Gonzalez had no concern about Appellant's mental state. (RR4:207).

Detective Dan Town searched Appellant's van but did not locate the murder weapon or any bloody clothing. (RR5:90; SX83-88). The interior of the van did have a powder cleaner that appeared to have been freshly sprinkled inside. (RR5:86).

Lisa Routh, a registered nurse, evaluated Appellant when he was brought to the Lew Sterrett Jail following his arrest. (RR5:175, 177, 183-85). At the time, Appellant "was just rocking back and forth. He was crying. He couldn't believe

he had done it.  He didn't know why he had done it."  (RR5:185).   Appellant also told Routh about the murders:

> He just talked to me about his father-in-law.  He was upset because his father-in-law - - he didn't know why he had killed him.   He said, he just got in his business - - he'd got in their business and it was just - - I only knew - - at that point, I only knew it was his father-in-law that he had killed.
>
> I knew he had come in with - - they told me it was murder.  And all he would talk about was his father-in-law and that he loved the man and he didn't know - -

(RR5:202).

Routh did not observe Appellant to be under the influence of drugs or alcohol.  (RR5:188).  He did not appear manic or paranoid.  (RR5:192).   Appellant reported that he suffered from depression and attention deficit disorder. (RR5:188).   He reported that the events of the day were repeating in his head. (RR5:193-94).   Routh believed that "[l]ike the event, he couldn't get passed it.  He was reliving it."  (RR5:194).  She did not believe he was psychotic.  (RR5:194).

> Routh testified that her encounter with Appellant stood out in her mind: Like, the one, They were out to get me.  He was rocking back and forth and he said - - he needed to know - - he had just left and he had went to the Taco Bueno to get him a breakfast burrito because he liked them and he knew it would be quite a while before he got another one and they just swarmed him.

(RR5:200-01).  She said, "The reason I remember [her encounter with Appellant] was because it was so bazaar [sic].  Most people don't rock back and forth crying and then talk about eating a burrito."  (RR5:207).

9

Dr. Joni McClain testified that Mary Davis' cause of death was "[m]ultiple sharp force injury." (RR5:158). Dr. Jill Urban testified that Ray Davis' "died as a result of multiple, sharp force injuries." (RR5:162, 164-71; SX178-84, 187-200).

Ron Krugjohann, a neighbor, testified that he was awake early in the morning on the day of the murders. (RR4:132). At about 5:30 a.m., Krugjohann looked outside his front window and noticed that "[a]cross the street directly in front of [his] house was a van that [he] did not recognize." (RR4:134, 136; SX83-84). The van was gone by 6:30 a.m. (RR4:136).

*Appellant's Case*

Brianna testified that during the week before the murders, when Donya had left, Appellant had trouble sleeping. (RR6:23-25). "He would stay up all hours of the night." (RR6:24). Brianna "could just tell he hadn't been [sleeping]." (RR6:25).

When the family went to church[2], Brianna went with Appellant while Danielle and Brett attended teen services. (RR6:30). During the service, Brianna and Appellant went to the altar to be prayed for; congregants placed their hands on them and prayed in tongues over them. (RR6:28-30). Brianna testified about Appellant's attitude after church:

---

[2] At one point, Brianna testified that this occurred on the Wednesday night immediately preceding the Thursday morning murders. Later, she testified that this occurred on the Sunday before the murders. (RR6:33).

10

> He was excited.  You know, he was telling all of our family that we went to church and that everything is going to be okay and that God's going to work all this - - it's all going to work out.

(RR6:31).

After church on January 25th, Brianna went to a friend's house, returning home between midnight and 12:30 a.m.  (RR6:42-43).  Brianna "went in my dad's room and we talked for a little bit and watched some TV and then I passed out."  (RR6:43).  While they watched television, Appellant dozed.  (RR6:43). Brianna woke up at 4 a.m. to use the bathroom and Appellant was not in bed. (RR6:45).  She assumed he was downstairs eating.  (RR6:45).  The next thing she remembered was Appellant turning on the light and telling Brianna to wake up and get Brett ready for school.  (RR6:45).  He asked her to take Brett to school. (RR6:45).  When Brianna asked Appellant why he couldn't take Brett to school, he told her that he had an emergency at work, then ran and got into the shower. (RR6:45).  At some point, Brianna heard Appellant scream that he cut himself. (RR6:45).  He came out of the bathroom with a towel around his hand; he was bleeding heavily.  (RR6:46).  He treated his cut with hydrogen peroxide, wrapped tape around it and left for work.  (RR6:46).

Dr. Antoinette McGarrahan, a psychologist specializing in forensic psychology and neuropsychology, performed a neuropsychological evaluation of Appellant.  (RR6:105, 109).  Dr. McGarrahan determined that Appellant was of

11

average intellectual ability. (RR6:115). Although he had no learning disabilities, he does experience "problems in the area of planning, organization, problem solving, [and] coping." (RR6:116). Appellant has low self-esteem and "sees his life as so negative and sees himself as so severely impaired that it raised a 'cry for help' response." (RR6:117-18). He has "significant difficulties" in his relationships with others. (RR6:118). He becomes panicked or fearful if he feels that he is going to be abandoned or rejected by people with whom he has significant relationships. (RR6:119). Dr. McGarrahan also reported that Appellant "has a long history of impulsivity . . . [He] is somebody who for many, many, years, most of his life, has acted without thinking, without thinking about the consequences and without being able to plan and prepare very well." (RR6:118). Dr. McGarrahan conceded that while Appellant may have experienced some impairments, he was able to own and operate a business. (RR6:132).

Appellant has a history of major depressive disorder and attention deficit hyperactivity disorder. (RR6:119-20). He has a generalized anxiety disorder. (RR6:120). He also exhibits "some borderline and dependent personality traits and those have caused him significant difficulties in his life." (RR6:120). An MRI of his brain showed that Appellant "had chronic microvascular ischemic changes[,]" meaning that he had problems with the arteries supplying oxygen to his

brain. (RR6:125). Microvascular changes are "fairly common[ly]" seen in MRIs of 50-year-old men. (RR6:148).

Dr. Jonathan Lipman, a neuropharmacologist, testified regarding the medications Appellant was taking at the time he committed the instant murders: Lexapro (an antidepressant); Adderral (an amphetamine) and Lamictal (an anticonvulsant also used to treat bipolar disorder). (RR6:153, 182-83). Lamictal was first prescribed for Appellant on January 4, a few weeks before the murders. (RR6:185). It was discontinued on January 19th because Appellant "was presenting with [an] itch[,]" a potentially life-threatening condition associated with anticonvulsant drugs. (RR6:186). That same day, Appellant's dosage of Lexapro was increased. (RR6:186). On the 23rd, Appellant was prescribed Trileptal, another anticonvulsant. (RR6:188-90).

<em>State's Case-in-Rebuttal</em>

Dr. Mitchell Dunn, a psychiatrist, testified that he interviewed Appellant on February 22, 2014. (RR8:17, 23). Dr. Dunn testified that Appellant's 30 milligram dose of Lexapro, while it was high, was "not an irrational dose." (RR8:28-29). Appellant's 60 milligram dose of Adderral is not uncommon. (RR8:29). The Lamictal and Trileptal were both prescribed at starting dosages, lower than what would be considered therapeutic. (RR8:29). Dr. Dunn testified that he "didn't see any evidence that the medications were having an adverse effect

13

on [Appellant]" at the time of the instant offense. (RR8:44-45). The following

exchange took place:

> [Prosecutor]: And, again, on what do you base that opinion?
>
> [Dr. Dunn]: Looking at what we know about his behavior and his statements before, during and after. An adverse medication effect doesn't just pop up and then go away. It's usually manifested by some type of physical problem, not simply by a psychosis or bazaar [sic], delusional belief. That simply is not something that's usually seen in psychiatry.
>
> We have information regarding the texts that he was sending in the hours just prior to this offense and we also have information regarding what he was saying and what his behavior was like. His texts were very consistent with the texts that he had been sending to Donya - - I just seen [sic] the ones that she received - - were very consistent in terms of coherence, logic, normal requests, nothing that seemed to be disorganized.
>
> If somebody is having to text, you know, that's - - I mean, we all fumble when we're texting, but I didn't even see mistakes in the texting. So, that shows some degree of his capacity, not just for his cognitive ability, but also for his physical abilities just prior to that time.
>
> Also we know from the records, from testimony, from interviews, that his behavior before the offense and just after the offense appeared to be, you know, well organized, structured and designed to try anything to create a situation in which it appeared as if he might not have been involved in the offense. That type of organized behavior, you know, the evidence that he was trying to make other people, like family members, believe that he had been there the whole time or that he had hurt himself in some other way, is not evidence of anybody that's had a significant problem in terms of their medication. It appears to be somebody who was thinking clearly and while maybe trying to avoid criminal prosecution, certainly not having problems in terms of their cognitive abilities or behavioral issues.

14

(RR8:46-48).

Dr. Dunn agreed with Dr. McGarrahan's assessment that Appellant suffers from depression and attention deficit disorder. (RR8:37-38). Although he agreed that Appellant suffers from anxiety, he did not agree that Appellant suffered from generalized anxiety. (RR8:38). Dr. Dunn also agreed that Appellant has a dependent personality. (RR8:38). With regard to the claim that Appellant was psychotic at the time he committed the instant offense, Dr. Dunn testified that he "[had] no evidence that Mr. Palmer was in a psychotic state at the time of the offense." (RR8:48). As to the claim that Appellant went to the Davis house and committed the instant offense as part of an effort to rid Donya of demons, the following exchange took place:

> [Prosecutor]: And with respect to him - - well, let me move on. Let me ask you, there's been a lot of talk in this trial about demons: Did he report - - in your interview, did Mr. Palmer report any hallucinations or delusions, anything like that?
>
> [Dr. Dunn]: I guess, it depends on how you understand this talk about demons.
>
> [Prosecutor]: From your perspective and part of your assessment, can you explain to that, how that would factor in here, this talk of demons?
>
> [Dr. Dunn]: Certainly. Mr. Palmer told me that he had discussed this possibility that Donya might have been afflicted by demons in some way and that's why she perhaps wanted to get the divorce, that she had been playing this Mafia Wars game and that he had heard that perhaps this could be some type of entry of portal to sin or portal to her soul and had discussed this with the daughter of the church [sic]

15

they went to the Wednesday before this event occurred and that she said, Yes, that's certainly a possibility. And so this was a belief that was endorsed by the pastor's daughter and he felt, you know that he could kind of accept that that was a possibility.

When Dr. Lipman testified about the psychosis, he talked about this belief in demons. It sounds from, at least from Mr. Palmer's description, this was something that the Pentecostal church kind of endorsed. If somebody was doing something wrong, that maybe they were afflicted by demons in some way and you could pray them out. In fact, he said that the minister's daughter said, You just need to pray really, really, hard for her.

A delusional belief is a false, fixed, belief. It's something that you believe that simply isn't true. Psychosis - - so there's no psychotic illness in which somebody - - massive people believe something that's not true. So, in this kind of situation, if indeed the church did believe that you did something wrong that that meant that you were afflicted by demons, I wouldn't consider that psychosis, but rather a kind of more extreme religious belief.

I think we've all - - you know, even if we don't belong to a Pentecostal religion, we have seen perhaps on TV, ministers who will decree this kind of thing, that if you - - if there's somebody who has done something bad or you've done something bad, that's the demon that's within you. That doesn't mean that there's 3 million people watching this church broadcast that believe - - that are all psychotic at the same time, it's just some kind of a more extreme religious belief.

    . . .

[Prosecutor]: Okay. And with respect to his assertions about, I went there to address the demons, in your assessment were there things factually about this case and from the evidence that are contrary, they don't square with his assertion to us?

[Dr. Dunn]: Yes.

[Prosecutor]: What are those, sir?

16

[Dr. Dunn]: Well, if he had gone on Wednesday and had determined from speaking to the pastor's daughter that there were these demons that were in Donya in some way - - he saw her that night. I mean, if there was something he wanted to do to get rid of the demons, that would have been the first time that he could have done so, but he was with family, there were children there, there were other witnesses. He was entirely normal in that interaction from what was described. I would think that if he had the psychotic belief from that Wednesday afternoon on, then Wednesday night, the first time he saw her, might have been his first opportunity to act.

The other thing was that he never, at any time, suggested in the interaction with the church that his in-laws were also some how [sic] afflicted by these demons nor did they indicate to him that he had to kill the demons. He told me that they simply said that he had to pray for her and try to find out the demons' name and if they found out their names, then perhaps he could pray and get them out of her more rapidly. The idea that he would have to kill them and then have to kill his in-laws because they got in the way somehow and then would have to go looking for a witness who wasn't afflicted in any way, shape or form by these demons, is not consistent with psychosis, rather with something entirely different.

(RR8:51-54).

Dr. Dunn testified that he received the records prepared by Nurse Routh when Appellant was initially brought to jail. (RR8:45). Appellant's blood pressure was "somewhat elevated." (RR8:45). Other than that, Appellant's vital signs were normal. (RR8:46).

## SUMMARY OF THE ARGUMENT

*Issue Nos. One and Two*: The trial court properly excluded the testimony of Dr. Kristi Compton. Dr. Compton did not have an opinion to offer regarding

17

Appellant's intent as it pertains to the capital murder of Mary and Ray Davis. Even assuming Dr. Compton had an opinion to offer, the probative value of the proffered evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. Alternatively, any alleged error is harmless.

*Issue No. Three*:  Appellant failed to preserve for this Court's review his claim that he was entitled to an instruction in the charge regarding the lesser-included offense of manslaughter.  In any event, while manslaughter is a lesser-included offense of capital murder, there is no evidence in the record that would have permitted the jury to reach a rational conclusion that if guilty, Appellant was guilty only of recklessly causing Mary's and Ray's death.

*State's Cross-Point*:  The judgment in this case should be modified or reformed.  The judgment reflects that Appellant was sentenced to life in prison.  In fact, Appellant was sentenced to life in prison without the possibility of parole.

## ARGUMENT

***STATE'S RESPONSE TO ISSUE NOS. ONE AND TWO: THE TRIAL COURT PROPERLY EXCLUDED THE TESTIMONY OF DR. KRISTI COMPTON.  ALTERNATIVELY, ANY ALLEGED ERROR IS HARMLESS.***

Appellant contends that the trial court erred in excluding the testimony of Dr. Kristi Compton regarding his diminished capacity to form the requisite intent

18

to commit the offense of capital murder. Appellant contends that he was deprived of relevant evidence and that he was deprived of a viable defensive theory. Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

During a sub rosa hearing in the guilt/innocence phase of trial, Appellant proffered the testimony of clinical and forensic psychologist Dr. Kristi Compton regarding Appellant's sanity and his capacity to form the requisite intent to commit capital murder at the time he committed the instant offense. (RR5:258-59). Dr. Compton conducted four diagnostic interviews with Appellant and administered various psychological tests. (RR5:260).

Dr. Compton testified that she could not render an opinion regarding Appellant's sanity. (RR5:261-63). The following exchange took place:

> [Defense Counsel]: Okay. And with respect to insanity, are you able to give an opinion as to whether or not you believe him to be insane?
>
> [Dr. Compton]: I cannot.
>
> [Defense Counsel]: Why is that?
>
> [Dr. Compton]: I was lacking information. There was information that's lacking from the time period of about 9:00 p.m. on that Wednesday until 6:00 a.m. in the morning that does not allow me to form a full opinion on whether he was insane at the time of the offense.

(RR5:261). She "[had] very limited information about what his mental state was during that time period." (RR5:262). Dr. Compton was then asked for her opinion

regarding Appellant's state of mind at the time he committed the instant offense.

The following exchange took place:

> [Defense Counsel]: And lastly, based upon all of your interviews, your testing, your documents that you have reviewed, have you formed an opinion as to his state of mind at the time of the commission of the offenses to form the requisite mental intent?
>
> [Dr. Compton]: I have formed an opinion - - a probability of his mental state at the time of the offense. Whether it's a requisite intent, that one, there is both factors for that he could not and factors that he could. So it kind of goes both ways.
>
> [Defense Counsel]: Okay. Do you believe that he had a diminished capacity based upon his - - how he presented?
>
> [Dr. Compton]: Yes. Based upon the information that I have available to me, I believe he was in a diminished mental state at the time of the killing.
>
> [Defense Counsel]: And may well not have been able to form the requisite intent - -
>
> [Dr. Compton]: He may not - -
>
> [Defense Counsel]: - - you just can't say that for sure?
>
> [Dr. Compton]: Pardon me?
>
> [Defense Counsel]: You just can't say that for sure?
>
> [Dr. Compton]: I cannot, no.

(RR5:261-62). Ultimately, Dr. Compton testified that she could not say for sure whether Appellant did or did not have the requisite intent to commit capital murder. (RR5:261-62).

20

Dr. Compton testified that Appellant gave her "his version of [his] mental state." (RR5:265). She testified that there were "some factors that corroborate it and some factors that do not." (RR5:265). Appellant told Dr. Compton the following:

> Specifically, he told me that he had gone to church. He began to believe that there was demonic oppression and this was the cause of his wife leaving him and being with the family. And as the days went on, he began talking to family and talking to the church members and he came to believe that this was a demonic or spiritual oppression and he had to rid his wife of the demonic forces.
>
> . . .
>
> He did not tell me [that he went to the Davis house to rid his wife of demonic forces] specifically. That was his explanation for what occurred. He told me that he woke up about 3:00, 4:00 in the morning, was at a well lit Laundromat and he went to the Davis' house, stayed in his van and was praying and calling out the names of the demons. Purportedly, the church had told him he had to call out the names of the demons to get them to go away. And that is his last recollection.

(RR5:267).

The prosecutor asked Dr. Compton for her understanding of the legal definition of intent. (RR5:268). Dr. Compton described intent as when "you have the mental capacity and the cognitive capacity to form the intent to commit whatever act you're going to commit, that there's nothing impairing your ability to do so." (RR5:268).

21

Dr. Compton testified that there was a "probability" that Appellant went to the Davis house in an effort to rid Donya of demonic possession. (RR5:268). When asked specifically whether Appellant intended to kill, Dr. Compton testified that she did not know. (RR5:269). She could testify to factors that would indicate that he was in a diminished mental state, but she could not ethically express an opinion as to whether Appellant intended to kill the complainants. (RR5:269).

The Court ruled that Dr. Compton's testimony would not help the jury. (RR5:271). The trial court stated that her testimony "would probably confuse [the jury] more than anything and muddy up things because she doesn't have - - she didn't say he's insane, she didn't say he has diminished capacity[.]" (RR5:271).

Later, during a hearing on Appellant's bill of review, Dr. Compton testified that she was prepared to testify regarding the probability that Appellant lacked the requisite mental capacity to commit capital murder. (RR6:5). She identified the various factors that she used to form her opinion. (RR6:6-9). Dr. Compton testified that "[t]hose are the things that caused me to pause. There is a likelihood or probability that he was in a diminished mental state." (RR6:9-10).

### *Standard of Review*

The trial court's decision to allow a witness to testify as an expert will not be disturbed on appeal absent a clear abuse of discretion. *See Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). "An abuse of discretion is shown only

22

when the trial court's ruling lies outside the 'zone of reasonable disagreement.'" *Hernandez v. State*, 438 S.W.3d 876, 878 (Tex. App.—Texarkana 2014, pet. ref'd) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). If the trial judge's decision is correct on any theory of law applicable to the case, it will be sustained. *See Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

### *Applicable Law*

#### *Right to Present a Defense*

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Even so, trial courts possess wide latitude to exclude evidence, which is only marginally relevant or poses an undue risk of confusion of the issues. *See id*. at 689-90.

#### *Rule 401: Relevant Evidence*

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401.

*Rule 403:  Probative v. Prejudicial*

Rule 403 provides that relevant evidence may be excluded if:

"its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Tex. R. Evid. 403.  When making a determination under Rule 403, an appellate court considers the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State,* 144 S.W.3d 487, 489 (Tex. Crim. App. 2004) (citing *Montgomery,* 810 S.W.2d at 389-390).

*Rule 702:  Expert Testimony*

Rule 702 of the Texas Rules of Evidence provides that a witness qualified as an expert may testify in the form of an opinion or otherwise if her "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702.  The proponent of scientific evidence must show, by clear and convincing proof, that the evidence is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue." *Gallo v. State*, 239 S.W.3d 757, 765 (Tex. Crim. App. 2007).

## Article 38.36(a)

Article 38.36(a) of the Texas Code of Criminal Procedure provides as follows:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Tex. Code Crim. Proc. Ann. art. 38.36(a). Evidence admissible under article 38.36(a) may be excluded under Rule 403 if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. *See* Tex. R. Evid. 403.

## Diminished Capacity

The Texas legislature has not enacted any affirmative defenses, other than insanity, based on mental disease, defect, or abnormality. *Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008). Thus, they do not exist in Texas. *Id*.

A defendant may, however, introduce evidence of his diminished capacity (mental illness less than insanity) if it negates his culpable mental state. *See Mays v. State*, 318 S.W.3d 368, 380-81 (Tex. Crim. App. 2010); *Jackson v. State*, 160 S.W.3d 568, 573-74 (Tex. Crim. App. 2005); *see also Penry v. State*, 903 S.W.2d 715, 768 (Tex. Crim. App. 1995) (Maloney, J., concurring) (distinguishing

diminished capacity as an affirmative defense from evidence of diminished capacity, which negates mental state). Generalized evidence of the defendant's mental health history, which is not related to the culpable mental state, is inadmissible. *See Ruffin*, 270 S.W.3d at 596 fn. 32 (citing *United States v. Cameron*, 907 F.2d 1051, 1067-68 (11th Cir. 1990)); *see also Lizcano v. State*, AP-75,879, 2010 Tex. Crim. App. Unpub. LEXIS 270, at *64-65 (Tex. Crim. App. May 5, 2010) (not designated for publication) (finding proffered evidence did not negate Lizcano's mens rea; it merely suggested general limitations in cognitive ability, intoxication at the time of the offense, and general deficits in adaptive functioning). Evidence that does negate the culpable mental state may still be excluded under Rule 403. *See Jackson*, 160 S.W.3d at 574.

### *Application of Law to Facts*

The trial court properly excluded Dr. Compton's testimony regarding Appellant's ability to form the requisite intent to commit capital murder. As a preliminary matter, Dr. Compton was unable to render an expert opinion on the very issue for which her testimony was proffered: whether, at the time of the offense, Appellant had the requisite intent to commit capital murder. As such, she would not be able to "assist the trier of fact to understand the evidence or to determine a fact in issue[.]" Tex. R. Evid. 702. When asked whether she formed

26

an opinion as to Appellant's "state of mind at the time of the commission of the offenses to form the requisite mental intent[,]" Dr. Compton testified as follows:

> I have formed an opinion - - a probability of his mental state at the time of the offense. Whether it's a requisite intent, that one, there is both factors for that he could not and factors that he could. So it kind of goes both ways on that.

(RR5:261). While she believed that Appellant was in a "diminished mental state," she was apparently conflicted as to whether that diminished mental state affected his ability to form the intent to commit capital murder. (RR5:261-62). On cross-examination, the prosecutor asked Dr. Compton very specifically whether she was going to express an opinion to the jury "as to whether or not [Appellant] intended to kill these people?" (RR5:269). Dr. Compton responded, "I cannot." (RR5:269). She summarized her anticipated testimony as follows:

> I think what I've been asked to provide is, does he have a mental disease or defect? Yeah. What were factors leading up to the offense? What were some of the factors that would indicate he was in a diminished mental state? And there are also factors that would indicate that he was not, specifically, in a diminished mental state.
>
> Ethically, I cannot say one way or the other if he formed the intent to kill Mr. and Mrs. Davis and his wife.

(RR5:269). Given this testimony, the trial court properly excluded Dr. Compton's testimony. *See Teel v. State*, No. 02-09-00150-CR, 2010 Tex. App. LEXIS 9391, at *5-6 (Tex. App.—Fort Worth, Nov. 24. 2010, pet. ref'd) (not designated for publication) (finding no abuse of discretion in excluding expert testimony where

27

the expert stated that he had no opinion regarding Teel's sanity or mens rea at the time of the offense); *Wiley v. State*, No. 09-07-00436-CR, 2009 Tex. App. LEXIS 225, at *6-7 (Tex. App.—Beaumont Jan. 14, 2009, pet. ref'd) (not designated for publication) (finding no abuse of discretion in excluding psychiatrist's testimony where witness could not offer an opinion as to Wiley's sanity at the time of the offense).

Even assuming, *arguendo*, that Dr. Compton had an expert opinion to offer regarding Appellant's diminished capacity to form the requisite intent, her testimony was nevertheless irrelevant as it failed to negate Appellant's intent as to the murder of the named complainants, Mary and Ray Davis.    The indictment in this case provides that on or about January 26, 2012, Appellant:

> Did unlawfully then and there intentionally and knowingly cause the death of an individual, to-wit:  RAYMOND DAVIS, by STABBING AND BY CUTTING DECEASED WITH A KINFE, A DEADLY WEAPON, AND A BOX CUTTER, A DEADLY WEAPON, AND A BLADED OBJECT, A DEADLY WEAPON, and during the same criminal transaction said defendant did then and there intentionally and knowingly cause the death of another individual, to-wit:  MARY DAVIS, by STABBING AND BY CUTTING DECEASED WITH A KNIFE, A DEADLY WEAPON, AND  A BOX CUTTER, A DEADLY WEAPON, AND A BLADED OBJECT, A DEADLY WEAPON.

(CR:17). Dr. Compton gave no testimony regarding Appellant's ability to form the requisite intent to intentionally or knowingly cause the death of *Mary Davis*.[3] Dr. Compton gave no testimony regarding Appellant's ability to form the requisite intent to intentionally or knowingly cause the death of *Ray Davis*. Dr. Compton's testimony addressed Appellant's state of mind[4] as it related to the murder of his wife Donya. While it is true that, at trial, evidence of Donya's murder was offered to provide context regarding the instant capital murder – Donya was the reason Appellant went to the Davis house that morning – Appellant was not on trial for her murder. He was on trial for the capital murder of Mary and Ray Davis. (CR:17). Dr. Compton gave no testimony as to Appellant's intent or state of mind as it related to the capital murder of Mary and Ray Davis.

Even as it pertains to Donya's murder, however, Dr. Compton's testimony still does not negate the requisite intent for capital murder. Dr. Compton did not testify that due to his mental illness or defects that it was not Appellant's conscious objective or desire to stab Donya or cause her death. She did not testify that

---

[3] Indeed, Mary and Ray Davis were only mentioned twice during all of Dr. Compton's testimony. During the initial *sub rosa* hearing, Dr. Compton stated that "[e]thically [she] cannot say one way or the other if [Appellant] formed the intent to kill Mr. and Mrs. Davis and his wife." (RR5:269). Then, during the hearing in connection with Appellant's bill of review, she testified that "[t]here were no indications, when [she] talked to anyone, that [Appellant] had a negative relationship with the Davises. To kill them as well did not seem completely rational to [her]." (RR6:9).

[4] As will be described in further detail below, Dr. Compton's testimony is better described as evidence of Appellant's state of mind as opposed to evidence of his diminished capacity to form the intent to commit capital murder.

29

Appellant believed he was stabbing someone other than Donya. She did not testify that due to his mental illness or defects that Appellant was not aware that his conduct was reasonably certain to cause Donya's death. Instead, she merely testified to Appellant's mental and emotional state in the time before and after the offense. (RR5:264-271). *See Yebra v. State*, No. 08-12-00201-CR, 2014 Tex. App. LEXIS 10875, at *10 (Tex. App.—El Paso Sept. 30, 2014, no pet.) (not designated for publication) (finding no abuse of discretion in excluding expert where the proffered testimony did not suggest that Yebra did not intend to injure his wife when he stabbed her repeatedly); *Marshall v. State*, No. 11-10-00057-CR, 2012 Tex. App. LEXIS 1083, at *21-22 (Tex. App.—Eastland Feb. 9, 2012, no pet.) (not designated for publication) (finding no abuse of discretion in excluding expert where the proffered testimony would not negate the required mens rea for the offense).

Taken as a whole, it is clear that Dr. Compton's testimony would have been simply an attempt to explain and excuse Appellant's actions. During her testimony on Appellant's bill of review, she gave a laundry list of reasons why Appellant's mental state was "probably" diminished, including, his prior mental health history; his extreme pathological separation anxiety; the fact that he was easily stressed; the lack of history of domestic violence; his return to the church; and, marital stress. (RR6:6-9). She still failed to explain, however, how or why

these factors affected Appellant's ability to form intent. Because Dr. Compton's testimony did not negate the requisite mens rea for capital murder it was irrelevant and inadmissible.

Even if this Court finds Dr. Compton's testimony relevant pursuant to article 38.36(a) as evidence of "the condition of [Appellant's] mind . . . at the time of the offense[,]" it was nevertheless inadmissible under Rule 403 as any probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. *See* Tex. R. Evid. 403. The probative value of Dr. Compton's testimony was low because, as stated above, she did not even have an expert opinion to offer regarding Appellant's intent. Further, Dr. Compton's testimony had the potential to impact the jury in an irrational and indelible way. To begin with, her definition of intent did not track the statutory definition. (RR5:268). Section 6.03 of the Texas Penal Code defines "intentionally" and "knowingly" as follows:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of this conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

31

Tex. Penal Code Ann. § 6.03 (a-b). Dr. Compton defined intent as when a person "[has] the mental capacity and the cognitive capacity to form the intent to commit whatever act you're going to commit, that there's nothing impairing your ability to do so." Appellant's intent to commit capital murder was very clearly the central issue to be decided during the guilt/innocence phase of trial. Given Dr. Compton's testimony, it is not clear that she knew or understood the legal definition of intent. *See Ward v. State*, AP-75,750, 2010 Tex. Crim. App. Unpub. LEXIS 94, at *12-13 (Tex. Crim. App. Feb. 10, 2010) (not designated for publication) (noting that the jury may be overly confused or misled where the expert's definition of "intent" was different than the statutory definition). Next, testimony that Appellant may have believed that Donya was suffering from demonic oppression would confuse the issues for the jury as they were charged with determining whether Appellant possessed the requisite intent to murder Mary and Ray Davis – not whether he possessed the requisite intent to murder Donya Palmer. Finally, the State notes that Appellant presented much of the proffered evidence through other witnesses. Dr. McGarrahan testified regarding his history of mental illness. Dr. Lipman testified regarding his medications and the fact that they had been recently changed. His daughter and two of his siblings testified to his stress, fatigue, and depression. Given the foregoing, the trial court did not abuse its discretion in excluding Dr. Compton's testimony. At a minimum, the decision falls within the

32

zone of reasonable disagreement. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

Even if this Court finds that the trial court erred in excluding Dr. Compton's testimony, which the State does not concede, any alleged error was harmless. *See* Tex. R. App. P. 44.2(b); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000) (remanding for a harm analysis under Rule 44.2(b) regarding Morales' claim that expert testimony was improperly excluded). Non-constitutional error that does not affect the substantial rights of the defendant is disregarded by the appellate court. *See* Tex. R. App. P. 44.2(b). A substantial right is affected when the error has a "substantial and injurious effect or influence in determining the jury's verdict." *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

Dr. Compton was not the lynchpin of Appellant's case. Throughout the trial, the defensive theory was that Appellant, who suffers from chronic mental illness, was depressed because his wife was leaving him and he had an adverse reaction to his recently changed psychiatric medications. Dr. Compton was not qualified to render an opinion on the issue of Appellant's medications. Indeed, she said so herself when she testified, "I'm not a psychopharmacologist. I'll let Dr. Lipman speak to that." (RR5:266-67). When this is then combined with the fact that Dr. Compton did not even have an expert opinion regarding Appellant's intent,

33

it is clear that any contribution she could have made to Appellant's case would have been weak at best.

Appellant was not precluded from presenting a defense. It is undisputed that he stabbed and killed Mary and Ray Davis. The only contested issue was his intent. In support of his position that he lacked the requisite intent, Appellant presented expert testimony from Dr. McGarrahan and Dr. Lipman. Dr. McGarrahan testified that Appellant has a history of major depressive disorder and attention deficit hyperactivity disorder and that he has a generalized anxiety disorder. (RR6:119-20). Dr. Lipman testified regarding the medications Appellant was prescribed and taking at the time of the offenses. (RR6:153, 182-83). He testified that Appellant's medications were changed or increased at the time of the offense. (RR6:186-90). Appellant also presented testimony from his daughter Brianna that during the week preceding the murders, Appellant was having trouble sleeping. (RR6:23-25). He presented testimony from his younger sister Susan that when Donya left, he was depressed, tired, and "spaced out[.]" (RR7:18). Susan testified that after Donya left, before the murders, Appellant started going back to church. (RR7:20-21). He became concerned that Donya's video game was a "portal of sin[.]" (RR7:21, 26). His brother Dave testified that Appellant was depressed and concerned about his finances. (RR7:48-50, 55). In light of the entire record in this case, this Court can have fair assurance that any error in

excluding Dr. Compton's testimony did not affect Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *King*, 953 S.W.2d at 271. Accordingly, any alleged error should be disregarded.

Appellant's first and second issues should be overruled.

***STATE'S RESPONSE TO ISSUE NO. THREE: APPELLANT HAS FAILED TO PRESERVE ERROR FOR THIS COURT'S REVIEW. IN ANY EVENT, EVEN ASSUMING ERROR WAS PRESERVED, THE TRIAL COURT PROPERLY OVERRULED HIS REQUEST FOR AN INSTRUCTION REGARDING THE LESSER-INCLUDED OFFENSE OF MANSLAUGHTER.***

Appellant contends that the trial court erred in failing to instruct the jury regarding a lesser-included offense. Specifically, Appellant contends that he was entitled to an instruction regarding the lesser-included offense of manslaughter. Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

During the charge conference, the following exchange took place:

[Trial Court]: Okay. Let's meet back here at 1:30. And I need everybody to look over the Charge before we get back.

> (Break taken, 12:15 – 1:38)
>
> (Open court, defendant present, no jury)

[Trial Court]: All right. Mr. Parks has looked over the Charge and he and Ms. Womble are here talking about it and it looks like it stands still as it is right now.

[Defense Counsel]: You're asking if we're okay with the Charge as it is?

35

[Trial Court]: I got your objections as to the inclusion of insanity as well as the lesser included of voluntary manslaughter.

[Defense Counsel]: Judge, I think we would also ask for negligent homicide.

[Trial Court]: To those I say, no, but your objections are noted.

(RR8:83-84). The trial court's charge to the jury did not contain instructions regarding any lesser-included offenses. (CR:500-04).

## *Applicable Law*

### *Lesser-Included Offenses*

The determination of whether the trial court should include a lesser-included offense instruction in the charge requires a two-step analysis: (1) whether the requested charge is for a lesser-included offense of the charged offense, and (2) whether there is trial evidence that supports giving the instruction to the jury. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011). An appellate court reviews the first step de novo. *See id*. An offense is a lesser included offense if: (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person suffices to establish its commission; (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or (4) it

36

consists of an attempt to commit the offense charged or an otherwise included offense. *See* Tex. Code Crim. Proc. Ann. art. 37.09.

In applying the second step, an appellate court must determine whether there is some evidence in the record that would permit a rational jury to find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Rice*, 333 S.W.3d at 145. The evidence must be "directly germane" to the lesser-included offense and must establish the lesser-included offense as a valid, rational alternative to the charged offense. *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012). "This second step is a question of fact and is based on the evidence presented at trial." *Id*. at 383.

*Charge Error*

An appellate court's first duty in evaluating a jury charge issue is to determine whether error exists. *See Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If error is found, the court should then analyze that error for harm. *See id*.

All objections to the charge must be made at the time of trial. *See* Tex. Code Crim. Proc. Ann. art. 36.19. In the event that there is no objection to the charge, an appellate court will reverse only if the record shows that the error was so egregiously harmful that the defendant was denied a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). The actual

degree of harm must be evaluated in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *See id.* "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005) (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

### *Application of Law to Facts*

As a threshold matter, it is the State's position that Appellant has failed to preserve for this Court's review, his complaint that the trial court improperly overruled his request for an instruction regarding the lesser-included offense of manslaughter. In order to preserve error regarding the jury charge there must either be an objection or a requested charge. *See Vasquez v. State*, 919 S.W.2d 433, 435 (Tex. Crim. App. 1996) (citing *Boles v. State*, 598 S.W.2d 274, 278 (Tex. Crim. App. 1980)); *see also* Tex. Code Crim. Proc. Ann. art. 36.14. The trial court stated, "I got your objections as to the inclusion of insanity as well as the lesser included of voluntary manslaughter[;]" however, there is nothing in the record to indicate when, how, or on what basis those objections were actually made. In his brief, Appellant cites the aforementioned exchange, however, the only charge requested by Appellant at that point on the record was negligent homicide.

Appellant does not point to any other place in the record showing that he made a request, either orally or in writing, that manslaughter be included in the charge. Appellant does not point to any other place in the record showing that he objected to the trial court's refusal to include an instruction regarding manslaughter in the charge. The trial court's statement suggests that that there may have been a discussion regarding the charge that took place off-the-record, but there is no specific evidence of a request or an objection regarding manslaughter. *See Blanton v. State*, No. 74,214, 2004 Tex. Crim. App. LEXIS 2210, at *35 (Tex. Crim. App. 2004) (not designated for publication) (finding Blanton failed to preserve his complaint regarding the failure to include certain instructions in the charge where he failed to request that the instructions be included and he failed to object to the omission of those instructions).

Nevertheless, reversal is not required because Appellant was not entitled to an instruction regarding manslaughter. The State agrees that the first prong has been met because Texas courts have recognized that manslaughter is a lesser-included offense of capital murder. *See Mathis v. State*, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002) (citing *Cardenas v. State*, 30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000)). The evidence in this case, however, fails to satisfy the second prong; there is no evidence that would permit a rational jury to find Appellant guilty only of manslaughter.

A person commits the offense of manslaughter if he recklessly causes the death of an individual. Tex. Penal Code Ann. § 19.04(a); *Arnold v. State*, 234 S.W.3d 664, 671 (Tex. App.—Houston [14th Dist.] 2007, no pet.). A person acts recklessly with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. Tex. Penal Code Ann. § 6.03(c). Thus, for Appellant to be entitled to a jury charge on manslaughter, there would have to be affirmative evidence that Appellant did not intend to cause death when he stabbed Mary and Ray, as well as affirmative evidence from which a rational juror could infer that Appellant was aware of but consciously disregarded a substantial and unjustifiable risk that their deaths would occur as a result of his conduct. *See Cavazos*, 382 S.W.3d at 385. The record contains no such evidence.

Appellant argues that "had Dr. Kristi Compton been allowed to testify [he] would surely have been entitled to a charge on manslaughter." (*See* Appellant's Brief p. 26). The State disagrees. As stated in response to Appellant's first issues, Dr. Compton had no evidence to offer regarding Appellant's intent as it related to the capital murder of Mary and Ray Davis. Indeed, during her proffer, Dr. Compton stated that "[e]thically, [she could not] say one way or the other if [Appellant] formed the intent to kill Mr. and Mrs. Davis and his wife." (RR5:269).

Thus, any claim that had Dr. Compton been allowed to testify she would have provided affirmative evidence entitling Appellant to an instruction on manslaughter is purely speculative. *See Cavazos*, 382 S.W.3d at 385 (stating that meeting the threshold under the second prong "requires more than mere speculation – it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense.").

Next, Appellant cites the testimony of Dr. McGarrahan and Dr. Lipman as "evidence . . . from which the jury could have reasonably inferred a lack of the necessary *mens rea* for the offense of capital murder." (*See* Appellant's Brief pp. 26-27). Again, the State disagrees with Appellant. Like Dr. Compton, neither witness provided affirmative evidence that Appellant only acted recklessly. Dr. McGarrahan testified regarding the psychological and cognitive testing she performed on Appellant. (RR6:117-18). She testified he "has a number of mental health issues" and that he has "a long history of impulsivity[.]" (RR6:118-20). She testified that Appellant suffers from depression, and acknowledged that "depression can range from . . . feeling down and blue to a severe depression that makes a person have a break with reality" but she did not testify that Appellant suffered any such break from reality when he stabbed Mary and Ray to death. (RR6:121). She testified that various stressors (job, finances, relationship) may exacerbate depression and that Appellant had those stressors in his life, but she did

not testify that Appellant's depression was exacerbated to the point that he lost touch with reality. (RR6:122-23, 127). Dr. McGarrahan testified that Appellant struggled to plan and organize, but she conceded that he was not void of the ability to do so. (RR6:131-32). Importantly, Dr. McGarrahan testified that she was "not here to provide an opinion one way or another on [the issue of Appellant's intent at the time he committed the instant offense]." (RR6:150). Dr. McGarrahan's testimony did not negate the evidence that Appellant stabbed Mary and Ray intentionally or knowingly, and she did not provide affirmative evidence that Appellant stabbed them recklessly.

Dr. Lipman testified regarding the medications Appellant was prescribed and taking at the time of the offenses. (RR6:153, 182-83). He testified that Appellant's medications were changed or increased at the time of the offense. (RR6:186-90). He testified that, in his opinion, the use of anticonvulsants "appears [to have] exacerbate[d] his depression." (RR6:193). In his report, Dr. Lipman wrote that "factors combin[ed] to produce a state of suicidal homicidality." (RR6:194-95; DX8). He testified that he believed that "whenever [Appellant] was experiencing demon possessions, he was psychotic." (RR6:207). When asked when the psychosis began, however, he testified that he did not know. (RR6:207). He later clarified that "if [Appellant] was acting under the belief that he was responding to the needs of demon possessions, then [he would] consider

that psychotic." (RR6:209). Dr. Lipman's testimony did not negate the evidence that Appellant stabbed Mary and Ray intentionally and knowingly, and he did not provide affirmative evidence that Appellant did so recklessly.

The record in this case does not support a charge of manslaughter. There is no evidence directly germane to recklessness. *See Cavazos*, 382 S.W.3d at 383, 385. And, there is no evidence that Appellant did not intentionally or knowingly cause the death of Mary and Ray. The record does not contain evidence that would have permitted the jury to reach a rational conclusion that if guilty, Appellant was guilty only of recklessly causing the death of Mary and Ray. Because the evidence presented at trial did not establish manslaughter as a valid, rational alternative to capital murder, the trial court did not err in failing to instruct the jury on manslaughter as a lesser-included offense. There is no error in the charge. Because there is no error in the charge, this Court should decide Appellant's third issue against him without reaching the issue of harm. *See Almanza*, 686 S.W.2d at 174.

Appellant's third issue should be overruled.

***STATE'S CROSS-POINT: THE JUDGMENT SHOULD BE MODIFIED OR REFORMED TO CORRECTLY REFLECT APPELLANT'S SENTENCE.***

The judgment in this case reflects that Appellant was sentenced to life in prison. This is incorrect. Appellant was sentenced to life in prison without the

43

possibility of parole.  The judgment should be modified or reformed to correct this error.

### *Applicable Law*

This Court has the authority to correct the judgment of the court below to make the record speak the truth when it has the necessary data and information to do so.  Tex. R. App. P. 43.2(b); *Bigley v. State,* 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993); *see also Estrada v. State,* 334 S.W.3d 57, 63-64 (Tex. App.—Dallas 2009, no pet.).

### *Application of Law to Facts*

The judgment should be modified or reformed.   According to the judgment in this case, Appellant's "Punishment and Place of Confinement" is "LIFE YEARS INSTITUTIONAL DIVISION, TDCJ[.]"  (CR:495-96). This is incorrect.   In fact, Appellant received a mandatory sentence of life imprisonment ***without the possibility of parole***.   (RR8:155)  *See* Tex. Penal Code Ann. 12.31(a)(2).   The State respectfully requests that this Court modify or reform the judgment to correct the identified error and affirm as modified.

## PRAYER

The State prays that this Honorable Court will modify and affirm the judgment in this case.

Respectfully submitted,

*Chrsf, Womle*

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

**Christine Womble**
**Assistant District Attorney**
State Bar No. 24035991
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

## CERTIFICATE OF COMPLIANCE

I hereby certify, as required by Texas Rule of Appellate Procedure 9.4(i)(2)(B), that the foregoing document contains 11,703 words, inclusive of all content.

*Chrsf, Womle*

Christine Womble

45

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief was served on Douglas Parks, attorney for Appellant, 321 Calm Water Lane, Holly Lake Ranch, Texas, 75765, via e-service, on September 15, 2015.

_____
Christine Womble